UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EDWARD W. SPARROW HOSPITAL ASSOCIATION
D/B/A SPARROW HOSPITAL
215 E. Michigan Avenue
Lansing, MI 48909

        Plaintiff,                           CIVIL ACTION NO.

            vs.

MICHAEL O. LEAVITT, Secretary
United States Department of
 Health and Human Services
 200 Independence Avenue, S.W.
 Washington, DC 20201,

        Defendant.

_____/

## COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

### I.    INTRODUCTION

1.    This is an action for judicial review of a final decision of the Secretary of Health and Human Services ("Secretary") denying Medicare payments to the plaintiff Edward W. Sparrow Hospital Association d/b/a Sparrow Hospital (the "Hospital") for costs incurred in 1998 and 1999 in connection with the Hospital's approved residency training programs. The Medicare payment at issue are payments for direct graduate medical education ("GME") costs and indirect medical education ("IME") costs. In administrative proceedings before the agency, the Secretary denied GME and IME payments relating to Hospital discharges of Medicare beneficiaries who were

1

enrolled in certain Medicare managed care plans ("HMOs"). The Secretary's decision was contrary to law and should be reversed.

2.      In 1997, Congress amended the Medicare statute to provide for IME and GME payments with respect to hospital discharges of Medicare beneficiaries enrolled in a Medicare HMO's. Pub. L. No. 105-33, §§ 4622 and 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)).   The 1997 legislation also required the Secretary to collect from the contracted Medicare HMO plans the data needed to make these payments to teaching hospitals. Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)). In contravention of those statutes, the Secretary denied the IME and GME payments at issue because he determined that the Hospital was late in furnishing unnecessarily duplicative claims, referred to as "UB-92 claims" for payment to the Secretary's "fiscal intermediary."

3.      In fact, though, the Hospital timely submitted claims for payment on the Secretary's prescribed claim forms to the Medicare HMO plans that enrolled the patients. Moreover, the HMOs submitted that same information on the same forms with respect to the same patients to the fiscal intermediary, before the intermediary rendered its final payment determination for the periods at issue. The Secretary nevertheless determined, incorrectly, that the Hospital should receive no IME and GME payments with respect to discharges of Medicare HMO patients because it did not submit the duplicate claims to the fiscal intermediary within a specific time period required under regulations that are expressly inapplicable when services are furnished, as in this case, on a prepaid capitation basis by a Medicare HMO. 42 C.F.R. § 424.30.

4.    The Secretary's decision is not only contrary to the controlling statutes and regulations he relied upon, but it is also invalid, and should be set aside, because it violates the public protections of the Paperwork Reduction Act. 44 U.S.C. § 3512(a). The Secretary did not obtain the required approval for the requirement, applied in this case, that hospitals submit duplicate claims for payment not only to the Medicare HMOs that make payments to hospitals for services furnished to plan enrollees, but also to the Medicare fiscal intermediaries. The public protection provision of the Paperwork Reduction Act, therefore, prohibits the Secretary from imposing any penalty upon, or withholding a benefit from, the Hospital due to its alleged failure to meet the Secretary's illegal requirement. Additionally, the Secretary's application of his triplicate billing requirement is arbitrary and capricious, and should be set aside, because the Secretary did not give the Hospital fair notice of such a requirement at a time when the Hospital could have met it.

## II.    JURISDICTION AND VENUE

5.    This is a civil action brought to obtain judicial review of a final agency decision of the Defendant Secretary of Health and Human Services as set forth in the Decision of the Administrator of the Centers for Medicare and Medicaid Services dated April 14, 2008, received by the Hospital on April 17, 2008. See Exhibit 1. This action is timely filed within 60 days of receipt of the April 14, 2008 final decision, pursuant to 42 U.S.C. §1395oo(f)(1).

6.    This action arises under Title XVIII of the Social Security Act, as amended (42 U.S.C. §§ 1395 et seq.) hereinafter referred to as the "Medicare Act" or the "Act," which establishes the

Medicare program (the "Medicare Program" or the "Program"), and the Administrative Procedure

Act ("APA"), 5 U.S.C. §§ 551 et seq.

7.     This Court has jurisdiction under 42 U.S.C.§ 1395oo(f)(1) (appeal of final Medicare

program agency decision).

8.     Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

9.     This Court has authority to grant the relief requested under 42 U.S.C. § 1395oo(f).

### III.    THE PARTIES

10.     Plaintiff EDWARD W. SPARROW HOSPITAL ASSOCIATION D/B/A SPARROW

HOSPITAL (hereinafter referred to as the "Hospital ") is an acute care inpatient hospital located in

Lansing, Michigan and is organized as a Michigan nonprofit corporation exempt from federal

income taxation as a charitable organization.  During the relevant period, the Hospital  was certified

as a "provider of services" participating in the Medicare program within the meaning of 42 U.S.C. §

1395x(u).

11.     The Defendant, MICHAEL O. LEAVITT, SECRETARY OF HEALTH AND

HUMAN SERVICES (hereinafter referred to as the "Secretary"), or his predecessors in office, is the

federal officer responsible for the administration of the Medicare Program pursuant to the Medicare

Act, references to the Secretary herein are meant to refer to him, his subordinates, and to his official

predecessors or successors as the context requires.

12.     The Secretary has delegated administration of the Medicare Program to the Centers

for Medicare and Medicaid Services ("CMS"), which is a component of the Department of Health

and Human Services with responsibility for day-to-day operation and administration of the Medicare program. At some times relevant to this case, CMS was known as the Health Care Financing Administration ("HCFA"). References to CMS herein are meant to refer to the agency and its predecessors.

IV.     **THE MEDICARE PAYMENT, COST REPORTING AND APPEAL PROCESS**

13.     The Medicare Act establishes a system of health insurance for the aged and the disabled. Under the Medicare Act, an eligible Medicare beneficiary is entitled to have payment made by the Medicare Program on his or her behalf for, *inter alia*, inpatient and outpatient hospital services provided to him or her by a hospital participating in the Medicare Program as a "provider of services."

14.     Pursuant to 42 U.S.C. § 1395cc, the Hospital entered into a written agreement with the Secretary to provide hospital services to eligible individuals.

15.     Under 42 U.S.C. §1395x(v)(1)(A), providers of inpatient hospital services, such as the Hospital, are entitled to payment from Medicare for their "reasonable costs" incurred in providing services to Medicare patients, in accordance with regulations adopted by the Secretary. Reasonable cost is defined as the "cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services." 42 U.S.C. §1395x(v)(1)(A).

5

16.     In adopting regulations, the statute requires the Secretary to "take into account both direct and indirect costs of providers or services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by [Medicare] will not be borne by individuals not so covered." *Id.*

17.     Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted a prospective payment system ("PPS") to reimburse hospitals, such as Hospital, for inpatient hospital operating costs. *See* 42 U.S.C. §1395ww(d). Effective with cost reporting years beginning on or after October 1, 1991, a complementary PPS process was implemented to reimburse hospitals, such as Hospital, for inpatient hospital capital-related costs. *See* 42 U.S.C. §1395ww(g).

18.     CMS, through fiscal intermediaries, pays providers participating in the Medicare Program for covered services rendered to Medicare beneficiaries. 42 U.S.C. § 1395h. The amount of payment owing to a provider for services furnished to Medicare beneficiaries is determined by the fiscal intermediary acting as an agent of the Secretary. 42 U.S.C. §1395h. The fiscal intermediary that acted on behalf of the Secretary with respect to the Hospital was Blue Cross Blue Shield Association and its subcontractors, Health Care Service Corporation ("HCSC") and, subsequently, National Government Services LLC ("NGS") (collectively referred to herein as the "Intermediary").

19.     At the close of its fiscal year, a hospital must submit a "cost report" showing the cost incurred by it during the fiscal year and the appropriate portion of those costs to be allocated to Medicare. 42 C.F.R. §§ 413.24 and 413.50. The hospital must submit its cost report in compliance with law. The hospital's intermediary is required to analyze and audit the cost report and issue a

Notice of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its Medicare reimbursement for the cost reporting period in compliance with law.

20.     A hospital has a right to obtain a hearing before the Provider Reimbursement Review Board ("Board" or "PRRB") by filing an appeal with the PRRB within 180 days of receiving its NPR if the provider "is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1886" of the Medicare Act. *See* 42 U.S.C. § 1395oo(a)(1)(A)(2). The PRRB has jurisdiction over appeals from the Secretary's determinations if the provider is dissatisfied with the Secretary's final determination, the amount in controversy is equal to $10,000 or more, and the provider requests a hearing within 180 days after notice of the Secretary's determination. 42 U.S.C. §1395oo(a). See also, 42 C.F.R.§§ 405.1837, 405. 1839(b).

21.     In exercising its authority to conduct hearings, the PRRB must comply with all the provisions of title XVIII of the Medicare Act and regulations issued thereunder, as well as CMS Rulings issued under the authority of the Administrator of CMS. 42 C.F.R. § 405.1867.

22.     The decision of the PRRB must be "supported by substantial evidence when the record is viewed as a whole." 42 U.S.C. § 1395oo(d)(3); 42 C.F.R. § 405.1871(a).

23.     Substantial evidence is defined as such relevant evidence as a reasonable mind might accept to support a conclusion." *Consolo v Federal Maritime Comm'n*, 383 U.S.607, 619-20 (1966).

24.     A hospital has the right to obtain judicial review of any final decision of the PRRB, or any reversal, affirmance, or modification by the Secretary by commencing an action within 60 days of the Hospital's receipt of such final decision. 42 U.S.C. §1395oo(f)

## V.    MEDICARE PAYMENT FOR GRADUATE MEDICAL EDUCATION ACTIVITIES RELATED TO SERVICES FURNISHED TO ENROLLEES IN HMO'S

25.    In addition to the inpatient and outpatient PPS, the Medicare program pays hospitals for the direct costs associated with graduate medical education activities ("GME Payment").  42 U.S.C. § 1395ww(h)(4)(E); 42 C.F.R. § 413.86.  (The regulation was recodified effective October 1, 2004 as 42 C.F.R. §§ 413.75 – 413.83.)

26.    In essence, the GME Payment for each fiscal year is based on (i) a hospital's predetermined  "per resident amount," determined and updated for inflation as prescribed by 42 C.F.R. § 413.86(e) (Recodified effective October 1, 2004 as 42 C.F.R. § 413.77), (ii) multiplied by the average of the weighted number of full time equivalent ("FTE") interns and residents the hospital trains during that year and the preceding two years, 42 C.F.R. §§ 413.86(f) and 413.86(g). (Recodified effective October 1, 2004 as 42 C.F.R. §§ 413.78 and 413.79), (iii) multiplied by the hospital's Medicare "patient load," *i.e.*, the percentage of Medicare inpatient hospital days  to total inpatient hospital days, 42 C.F.R. § 413.75(b).

27.    Medicare payments to hospitals also include an adjustment for the indirect costs associated with graduate medical education ("IME Adjustment"). 42 U.S.C. § 1395ww(d)(5)(B)(iv); 42 C.F.R. § 412.105.

28.    Sections 4622 and 4624 of the Medicare Balanced Budget Act of 1997 (codified as 42 U.S.C. § 1395ww(d)(11)) and 42 U.S.C. § 1395ww4624 (h)(3)(d)), mandate that the Secretary make payment to participating Medicare hospitals for indirect medical education ("IME") and direct

8

medical education ("GME") for patients covered by managed care plans, also referred to as "health maintenance organizations" ("HMO's").

29.    Beginning on January 1, 1998, and throughout the 1998 and 1999 cost reporting periods at issue in this case, the IME payment calculation considers estimated average payments per discharge that would have been paid under the prospective payment system for hospital discharges of Medicare beneficiaries who were enrolled in an HMO when they received services from the hospital. 42 U.S.C. § 1395ww(d)(11); 42 C.F.R. §§ 412.105(g).

30.    The additional IME payments provided with respect to teaching hospitals' discharges of Medicare HMO enrollees were to be phased in gradually over a five-year period in which like amounts were to be removed from the capitation rates paid by the Secretary to the Medicare HMOs. See 42 U.S.C. §§ 1395ww(d)(11)(C), 1395ww(h)(3)(D)(ii); 1395w23(a)(3)(B)-(C); see also 42 C.F.R. § 422.254(c) and (e)(2).

31.    Similarly, beginning on January 1, 1998, and throughout the 1998 and 1999 cost reporting periods at issue in this case, the GME payment calculation provides for additional GME payment to a teaching hospital with respect to patient days associated with Medicare beneficiaries who are enrolled in Medicare HMOs. See 42 U.S.C. § 1395ww(h)(3)(D)(i)(II); 42 C.F.R. § 413.86(d).

32.     The governing Medicare regulation, 42 C.F.R. § 413.86(d)(3),[1] provides that "[f]or portions of cost reporting periods beginning on or after January 1, 1998, the product derived in step one [i.e., the updated per resident amount] is multiplied by the proportion of the hospital's inpatient days attributable to individuals who are enrolled under a risk-sharing contract with an eligible organization under section 1876 of the [Medicare] Act and who are entitled to Medicare Part A or with a Medicare+Choice organization under Title XVIII, Part C of the [Medicare] Act."

33.     In the Balanced Budget Act of 1997, Congress directed the Secretary to require the Medicare HMO contractors to submit data, and any other information the Secretary deemed necessary, regarding inpatient hospital services furnished to Medicare HMO enrollees. Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)).

34.     In the preamble to a final rule published in the Federal Register on August 29, 1997, the Secretary acknowledged that Congress had amended the Medicare Act to provide for IME and GME payments with respect to Medicare HMO enrollees, that Congress required the Secretary to collect necessary data from the contracted HMOs to implement adjustments to the capitation rates paid to them, and that the agency was "considering the data requirements necessary to implement both the direct and indirect medical education and [Medicare HMO] risk adjustment provisions." 62 Fed. Reg. 45965, 46007.

35.     In the preamble to a final rule published in the Federal Register on May 12, 1998, the Secretary stated: "We anticipate teaching hospitals will need to submit claims associated with

---

[1]         Effective October 1, 2004, this regulation was split into nine individual sections. The current

10

Medicare+Choice discharges to the fiscal intermediaries for purposes of receiving indirect and direct medical education payments." 63 Fed. Reg. 26318, 26342. The Secretary did not adopt such a requirement in that rule.

36.    On June 26, 1998, CMS published notice of an interim final rule in the Federal Register, and adopted a regulation, requiring Medicare HMOs to submit hospital encounter data to the Medicare fiscal intermediaries for each HMO's own enrollees. 63 Fed. Reg. 34968, 35092 (June 26, 1998). The regulation, codified at 42 C.F.R. § 422.257(a), states:

> Each M+C organization must submit to CMS (in accordance with CMS instructions) all data necessary to characterize the context and purposes of each encounter between a Medicare enrollee and a provider, supplier, physician, or other practitioner.

37.    The June 1998 rule further provides that the HMOs' submission of this data to the Medicare fiscal intermediaries must "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate." 42 C.F.R. § 422.257(d).

38.    The Secretary further clarified in the preambles to the 1998 interim final rule and a later rule that the HMOs were required to submit hospital encounter data to the fiscal intermediaries on the same form (UB-92) and in a format that is "identical" to the form and format of hospital claims for payment to the intermediaries, because "pricing of discharges" of Medicare HMO enrollees would be required to recalibrate the capitation payments made by CMS to the HMOs. 63 Fed. Reg. at 35006; 65 Fed. Reg. 40170, 40249 (June 29, 2000).

39.    In July 1998, CMS issued a program memorandum (the "Program Memorandum") regarding the provision for additional GME and IME payments with respect to discharges of

---

section is 413.76(c).

hospitals patients enrolled in Medicare HMOs. Program Memorandum (Intermediaries), HCFA Pub. 60-A, Trans. No. A-9821 (Jul. 1, 1998).

40.    The Program Memorandum was addressed to the Medicare fiscal intermediaries. The Program Memorandum principally addressed "intermediary and standard system changes needed" to provide IME and GME payments with respect to Medicare HMO enrollees. *Id.*

41.    The Program Memorandum instructed the fiscal intermediaries to notify providers, such as the Hospital, within 3 business days after the intermdiaries' receipt of the Program Memorandum, that: "Teaching hospitals may submit bills for inpatient stays by managed care enrollees for payment of IME." *Id.*

42.    The Program Memorandum did not instruct the intermediaries to give hospitals notice that they must submit claims to the intermediary in order to receive IME or GME payments with respect to hospital discharges of Medicare HMO enrollees.

43.    The Program Memorandum also did not instruct the intermediaries to give hospitals notice as to any required time period for submission of claims to the intermediaries in order to receive IME or GME payments with respect to hospital discharges of Medicare HMO enrollees.

44.    The Program Memorandum was not published for notice and comment in the *Federal Register*.

45.    In the preamble to a final rule published in the Federal Register on June 29, 2000, the Secretary responded to comments regarding the June 1998 interim final rule, discussed above, and the submission of encounter data regarding hospital discharges of Medicare HMO enrollees. 65 Fed. Reg. 40170, 40249.

46.     In his response to those comments, the Secretary acknowledged a "range of problems in the submission of encounter data," including intermediary processing problems and confusion regarding hospital submission of encounter data. 65 Fed. Reg. at 40249.

47.     In order to address some of those problems, the June 2000 rule established a retrospective reconciliation process for encounter data that was submitted late by the Medicare HMOs to the Part A fiscal intermediaries.  See 65 Fed. Reg. at 40250; see also 42 C.F.R. § 422.257(g)(2).

48.     This reconciliation process was established to allow the HMOs the benefit of appropriately recalibrated capitation payment rates that take into account all the relevant available encounter data concerning hospital discharges of Medicare HMO enrollees, including data that was untimely submitted by the HMOs to the fiscal intermediaries.  See 65 Fed. Reg. at 40250.

49.     In February 2003, CMS issued a program memorandum concerning GME payments with respect to Medicare HMO enrollees who are treated by certain hospitals that are exempt from the prospective payment system. Program Memorandum, Trans. No. A-03-007 (Feb. 3, 2003), Provider Exhibit 25.

50.     The February 2003 memorandum acknowledged that CMS' prior guidance had failed to address how the agency would make GME payments with respect to Medicare HMO patients of hospitals that are exempt from the prospective payment system.

51.     The February 2003 memorandum stated that these hospitals "must submit claims to their regular intermediary in UB-92 format" to obtain GME payments with respect to Medicare HMO patients, but this requirement was made effective only prospectively beginning July 1, 2003.

52.    The February 2003 memorandum also stated that GME payments to these hospitals with respect to Medicare HMO patients in prior periods would be addressed by the agency "in a separate issuance," which, on information and belief, was never published anywhere if it was ever issued at all

## VI.    <u>FACTS SPECIFIC TO THE HOSPITAL</u>

53.    The facts set forth here are supported by the Administrative Record which the Secretary is required to file with the Court when the Secretary files his answer or other response to this Complaint. "TR" signifies references to the transcript of the administrative proceedings before the Provider Reimbursement Review Board, below, conducted on August 25, 2005.

54.    The Intermediary failed to exercise its duty to  provide to the Hospital the notice required by the Program Memorandum within three business days, and the Intermediary did not furnish the notice at any time thereafter.  (TR at 29-32; 55-57; 59-65; 67-68; 77-78; 80-81; 84; 89-92).

55.    Specifically, the Intermediary failed to exercise its duty to notify the Hospital that the Intermediary required the Hospital to file a UB-92 claim form for each Medicare HMO patient the Hospital served as a condition to receiving the applicable IME and GME payment to which the Hospital was entitled for furnishing services to such patients.

14

56.    When the Hospital became aware that the Intermediary required the Hospital to file UB-92 claims for Medicare HMO patients, the Hospital filed the UB-92 claims but the Intermediary rejected the claims based on a purported billing deadline which had expired. (TR 33-34.)

57.    As a result of the failure of the Intermediary to exercise its duty to provide the required notice to the Hospital, for portions of the relevant period the Hospital did not file the UB-92 claim form for Medicare HMO patients despite the fact that it was, and is, undisputed that the Hospital furnished Medicare-covered services to such patients.

58.    Solely because the Hospital did not file the UB-92 claim form for Medicare HMO patients, the Intermediary denied the Hospital the IME and GME payment to which the Hospital was entitled relating to the provision of services to Medicare HMO patients.  The estimated Medicare payment at stake was $527,044.

59.    The necessary information with which to process payment to the Hospital remained, and continues to remain, available.  (TR 35.)

60.    Because the necessary information with which to process payment to the Hospital remained, and continues to remain, available, the Hospital could, and still can, simulate the UB-92 filing in substantially the identical form as if such filing had been made during the period that the Intermediary required it to be made.  (TR 37-38, 44-46, 50-52, 72-75.)

## VII.    PROCEEDINGS BEFORE THE ADMINISTRATIVE AGENCY BELOW

61.    The Hospital timely requested a hearing before the PRRB, pursuant to 42 U.S.C. § 1395oo(a), to appeal the Intermediary's disallowance of the Hospital's .GME and IME payments for relating to services furnished to Medicare HMO patients during the Hospitals fiscal years ended December 31, 1998 and December 31, 1999.

62.    The PRRB conducted a hearing on August 25, 2005.

63.    The issue before the PRRB was whether the Hospital was entitled to receive indirect medical education and direct graduate medical education payments for Mediare+Choice [*i.e.*, HMO] enrollees for FYE's 12/31/98 and 12/31/99.

64..    Representatives of the Hospital and the Intermediary appeared as witnesses to testify before the PRRB, and were subject to examination, and cross examination by the respective legal counsel of the Hospital and the Intermediary. The PRRB had the opportunity to examine, and in fact did examine, the witnesses.

65.    The PRRB issued its decision dated February 12, 2008, deciding by a 4-1 majority in favor of the Hospital.  See Exhibit 2.

66.    Upon review of the applicable legal authority, the PRRB found that the UB-92 requirement of the Intermediary was contrary to law: "Nowhere does the Board majority find a directive to the Provider that states that in order to receive IME and DGME supplemental payments a

provider **must** bill the intermediary.  The Administrative Bulletin simply states that you 'may' bill."
(Exhibit 2. P.8.) (Emphasis in original.)

67.    The PRRB further found that CMS failed to follow the Administrative Procedures
Act, and as a result the PRRB held "that the Intermediary's disallowance of the subject Medicare
managed care discharge/patient days, based on the fact that the Provider did not bill and the data was
not captured n the PS&R, is without basis.  (Exhibit 2., Pages 8-9.)

68.    In response to the request of  the Center of Medicare Management that the CMS
Administrator review the PRRB decision, by letters dated March 5, 2008, the Administrator of CMS
notified the Hospital and the Intermediary that the Administrator of CMS would review the PRRB
decision and that the Hospital and the Intermediary had the opportunity to submit comments.

69.    In a decision dated April 14, 2008, received by the Hospital on April 17,2008, the
CMS Deputy Administrator reversed the decision of the PRRB that the Hospital was not required to
file UB-92 claims as a condition to receiving IME and GME payment for services furnished to
Medicare HMO patients.  (Exhibit 1.)

70.    The decision of the Deputy Administrator of CMS constitutes the final decision of the
Secretary over which this Court enjoys jurisdiction. 42 U.S.C. § 1395oo(f)(1).  Thus, the Hospital
has exhausted administrative remedies, this case is ripe for judicial review and this Court has
jurisdiction over this action.  42 U.S.C. § 1395oo(f)(1).

71.     Based on the record established in the administrative proceedings, below, the final decision of the Secretary is unlawful and must be set aside because it is contrary to law, arbitrary and capricious, and not based upon substantial evidence in the record. See 42 U.S.C. § 1395oo(f); 5 U.S.C. § 706.

## VIII.  ASSIGNMENT OF ERRORS

72.     The Secretary's denial of IME and GME payments with respect to services the Hospital furnished to Medicare HMO patients should be set aside for the following reasons:

A.     The Secretary's denial is inconsistent with the 1997 legislation providing for such payments to be made to teaching hospitals like the plaintiff Hospital and requiring the Secretary to collect from the Medicare HMOs the encounter data needed to properly make those payments to teaching hospitals. Pub. L. No. 105-33, §§ 4001, 4622 and 4624 (codified at 42 U.S.C. §§ 1395w-23(a)(3)(B), 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)).

B.     The Secretary's denial also is inconsistent with the plain language and intent of the regulations establishing procedures and time periods for submission of claims for payment to the Medicare Part A intermediaries in all cases except when services are furnished on a prepaid capitation basis by a Medicare HMO. 42 C.F.R. § 424.30.

C.     The Secretary's interpretation of the aforementioned regulations in his final decision below also is invalid because (i) it represents an unexplained departure from agency precedent interpreting those regulations as not applying to services furnished on a prepaid

18

capitation basis by a Medicare HMO, St. Anthony's Health Center, CMS Adm'r Dec. (July 19,

2006), reprinted in MEDICARE & MEDICAID GUIDE (CCH) ¶ 81,547; and (ii) the agency did not

invoke the notice and comment rulemaking procedures mandated by the APA in adopting the

contrary interpretation of the rule that was applied in the final decision in this case.

      D.      The Secretary's denial and the program instructions he relied upon also violate the

public protection provision of the Paperwork Reduction Act, 44 U.S.C. § 3512(a), and are otherwise

arbitrary and capricious, because the Secretary did not obtain the required approval for a new

requirement that teaching hospitals must submit unnecessarily duplicative payment claims both to

Medicare HMOs and to Medicare Part A fiscal intermediaries in order to receive the IME and GME

payments due under the Medicare Act.

      E.      The Secretary's denial is not supported by substantial evidence, where the PRRB

found that the Intermediary failed to exercise its duty, as required by the Program Memorandum,

to notify the Hospital of the purported requirement to file UB-92 claims as a precondition to the

receipt of IME and GME payment for services furnished to Medicare HMO patients.

      F.      In addition, the Secretary's denial is otherwise arbitrary, capricious and otherwise

contrary to law because the Hospital was not given fair notice of a requirement to submit duplicate

bills both to Medicare HMOs and Medicare Part A intermediaries in order to receive the IME and

GME payments due under the Medicare Act, and, in the circumstances presented, the Secretary

should have waived the claims filing requirements he says were applicable here.

## IX.  **REQUESTED RELIEF**

**WHEREFORE**, the Hospital respectfully requests an order:

A.      declaring invalid the Secretary's final decision denying the Hospital IME and GME payments with respect to services furnished to Medicare HMO patients;

B.      reversing the Secretary's final decision and requiring the Secretary promptly to pay the Hospitals all sums due as a result of the reversal of that decision, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

C.      requiring the Secretary to pay legal fees and costs of suit incurred by the Hospital; and

D.      providing such other relief as the Court may deem just and  appropriate.

Respectfully submitted,

By: _Kenneth R. Marcus_ (signature)

Kenneth R. Marcus
DC Bar No: MI0016
HONIGMAN MILLER SCHWARTZ AND COHN LLP
660 Woodward Avenue
2290 First National Building
Detroit, Michigan 48226
Phone: (313) 465-7470
Fax:     (313) 465-7471
kmarcus@honigman.com

Counsel for Plaintiff

Date: June 12, 2008

DETROIT.3144950.1

21

Apr-18-2008  09:56am  From-SPARROW HOL. ACCOUNTING DEPT          +15173646057      T-278  P.002  F-320

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



_CENTERS for MEDICARE & MEDICAID SERVICES_

---

Office of the Attorney Advisor

APR 1 4 2008

**VIA CERTIFIED MAIL**

Mr. Gary Reetz
Edward W. Sparrow Hospital Association
1215 E Michigan
P.O. Box 30480
Lansing, MI 48909-7980

Re:  Sparrow Health 98-99 IME Managed Care Group, PRRB Decision No. 2008-D17

Dear Mr. Reetz:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board. This constitutes the final administrative decision of the

Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc:  Bernard M. Talbert, Esquire, Intermediary's Representative

Apr-18-2008  09:56am  From-SPARROW HOS. ..CCOUNTING DEPT       +15173646057        T-278  P.003  F-320

# CENTERS FOR MEDICARE AND MEDICAID SERVICES
### *Decision of the Administrator*

| In the case of: | Claim for: |
|---|---|
| Sparrow Health 98-99 IME Managed Care Group,<br><br>                    Provider<br>                    vs.<br><br>Blue Cross Blue Shield Association/ United Government Services,<br><br>                    Intermediary | Provider Cost Reimbursement Determination for Cost Reporting Periods Ending: 12/31/98–12/31/99<br><br><br>Review of:<br><br>PRRB Dec. No. 2008-D17<br>Dated: February 12, 2008 |

---

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in Section 1878(f)(1) of the Social Security Act (Act), as amended (42 U.S.C. 1395oo(f)). Comments were received from the Center of Medicare Management (CMM) requesting reversal of the Board's decision. The parties were subsequently notified of the Administrator's intention to review the Board's decision. The Providers submitted comments requesting affirmation of the Board's decision. Accordingly, this case is now before the Administrator for final administrative review.

### ISSUE AND BOARD DECISION

The issue concerns whether the Providers are entitled to receive additional indirect medical education (IME) and direct graduate medical education (DGME) payments for Medicare managed care enrollees.

The Board found that St. Lawrence Mercy had not claimed any Medicare managed care discharges/patient days in its 1998 cost report, nor did it claim additional reimbursement for IME and DGME pursuant to the Balance Budget Act of 1997 (BBA '97).[1] The Board concluded that it did not have jurisdiction over St.

---

[1] See Pub. L. No. 105-33.

Apr-18-2008 09:57am From-SPARROW HO ACCOUNTING DEPT        +15173646057        T-278  P.004  F-320

2

Lawrence Mercy Hospital's challenge and dismissed it from the case. With respect to E.W. Sparrow, the Board Majority found that the final determinations with respect to Medicare managed care days and discharges were rendered by the Intermediary, thereby, meeting the jurisdictional requirements of the regulations.

The Board noted that, the BBA '97 provided for IME and DGME payments for services provided under risk Health Maintenance Organization (HMO) contracts, that had not been available prior to the BBA. The Secretary was given broad authority to provide for, or devise a way, to pay hospitals a supplemental payment for DGME and IME services under Sections 1886(h)(3)(D) and 1886(d)(11) of the Act.

The Board Majority found that this dispute was governed by the regulations at 42 C.F.R. §424.30, *et seq*. The Board noted that, prior to BBA '97, in order to receive payment for the services furnished to Medicare beneficiaries, a hospital filed a claim for payment directly with its Medicare intermediary. However, if the beneficiary was a member of a risk HMO, which had been prepaid by Medicare, the hospital filed its claim for payment for services furnished with the HMO, rather than the intermediary. The claims in question involve services furnished and paid for by Medicare + Choice organizations or other Medicare risk plans and, thus, are specifically exempt from the requirements, procedures and time limits under this section.

While prior to the BBA '97, hospitals were required by the Hospital Manual to file 'no pay' [encounter data] bills for tracking or utilization purposes only,[2] the Board explained that the BBA '97 and the Secretary's implementing regulations shifted the burden for filing encounter data to the HMOs.

The Board Majority recognized that no changes were made to 42 C.F.R. §424.30. However, the Board relied on the fact that, neither the regulatory changes implementing the new IME/DGME payment, nor any other regulation, gave notice that hospitals would be required to file a separate IME and DGME claim with the Intermediary that was virtually identical to the claim filed with the HMO to recover payment for inpatient services.

The Board Majority further explained that, when the regulation which governs claims filing was implemented at 42 CFR § 424.30, there was no contemplation of, or any need for, a "claim for payment" other than the claim to obtain payment for the inpatient services furnished to the beneficiary. The Board noted that, when the additional payment for IME/DGME was authorized by the BBA '97, it did not

---

[2] CMS Program Manuals -- Hospital (PUB. 10), Chapter IV -- Billing Procedures 411. Submitting Inpatient Bills in No-Payment Situations.

Apr-18-2008  09:57am  From-SPARROW H...  ACCOUNTING DEPT          +15173646057        T-278  P.005  F-320

3

change the nature of the payment for "services furnished." Rather, the IME and DGME payment arises from "services... furnished on a... capitation basis..." for which filing a claim with the intermediary is expected under 42 C.F.R. § 424.30.

The Board Majority recognized that the Secretary has been given broad authority to implement procedures for payment. However, the Board found that, once the system was established by regulation linking the obligation to file an intermediary claim with the method of payment, CMS' effort to impose a contrary claims filing requirement pursuant to guidance in an Administrative Bulletin is insufficient notice to deprive a provider of its statutory right to payment.

The Board Majority noted that the Administrative Bulletin issued by the Intermediary stated that "teaching hospitals <u>may</u> submit bills for inpatient stays by managed care enrollees for payment of IME." This Bulletin addressed only "IME cost" payments and did not specify a definite date when this billing should begin or make any reference to CMS Program Memorandum (PM) A-98-21 for further guidance.

The Board Majority did not find persuasive, a directive to the Provider that states that in order to receive IME and DGME supplemental payments, a Provider must bill the Intermediary. The Board found that the Medicare Bulletin states that you "may" bill. The Board argued that CMS should have followed the Administrative Procedure Act's (APA) prescribed "informal rulemaking" process and made provisions to handle the period from January 1, 1998, until the finalization of the rule. If the regulatory obligation to file a "claim" is to be bifurcated, so that the Provider has an obligation to file its claim for payment of services provided to the beneficiary with the HMO and to also file a virtually identical claim to the Intermediary, then the Board Majority believed that a regulatory notice is required.

The Board Majority found that the Intermediary's disallowance of the subject Medicare managed care discharges/patient days, based on the fact that the Provider did not bill and the data was not captured on the Provider Statistical & Reimbursement (PS&R) report, is without basis. The Board was unpersuaded by the Intermediary's argument that a claim filed in the UB-92 format is essential to determine a proper payment amount. The Board reasoned that, for the period from January 1, 1998, up until the date of notice, the option to bill and receive an interim payment was not available, and the use of an alternate method was necessary to allow providers to make a request for these payments. The Board Majority noted that the Provider has the information necessary for the Intermediary to pay the Provider the IME and DGME amounts to which it is entitled.[3]

---

[3] See Provider's Position Paper at 3; Provider's Supplemental Position Paper at 6; and Transcript of Oral Hearing (Tr.) at 33-35.

Apr-18-2008  09:57am    From-SPARROW HOSP ACL... ING DEPT         +15173646057        T-27u  P.006/019  F-320

4

Thus, the Board Majority found that the Provider is entitled to receive additional IME and DGME payments for Medicare managed care enrollees for its fiscal years ending December 31, 1998 and 1999, and remanded the case to the Intermediary to include the days applicable to the Medicare + Choice enrollees.

One Board member dissented. The Dissent disagreed with the Board Majority's finding of jurisdiction over the Medicare + Choice discharges/days claimed by E.W. Sparrow Hospital. The Dissenter found that the Provider failed to claim on its as-filed cost reports, the discharges/days at issue.

Despite the jurisdictional finding, the Dissent commented on the substantive nature of the Board's Majority decision. The Dissent argued that Transmittal No. A-98-21 was an appropriate means by which to implement program payments provided for in the applicable IME and DGME statutes and regulations. The Dissent also reasoned that the requisite claims for the additional reimbursement were not exempt from submission to the Intermediary pursuant to 42 C.F.R §424.30 and that these claims were not claims for services "furnished on a prepaid capitation basis by a health maintenance organization..." as envisioned by the section. CMS notified intermediaries and the public regarding the added payments for Medicare managed care enrollees when it formally modified the IME and GME regulations on August 29, 1997 (62 Fed. Reg. 45565, 45968-45969). CMS' publication of PM A-98-21 instructed intermediaries to notify their hospitals of the right to request the additional payments and the methodology that was required to secure them. The Dissenter found that there was no need for CMS to publish a new regulation with the required notice and comment period.

The Dissent noted, that although the Provider maintained that it did not receive timely notice of the requirement to file the UB-92 claim forms, there is un-controverted evidence in the record demonstrating that the Provider had notice as early as March 11, 1999.[4] The Dissent noted that there was convincing evidence presented by the Intermediary witness' testimony that the Provider had notice of the requirement before this date. The testimony showed she discussed the billing requirement with the Provider's staff prior to the March 1999 Medicare Memo.[5]

The Dissent argued that, to the extent that the Provider ignored the Program's claims filing requirement, it did so to its detriment. The Provider was responsible for claiming all the reimbursement to which it was entitled and it received timely notification of the manner in which that reimbursement could be secured. The Dissent concluded that the Intermediary's refusal to compute the additional IME and

---

[4] See, Intermediary Position Paper, Exhibit I-2.
[5] See, Tr. at 58-59, 90.

the applicable IME and DGME statutes and regulations.

Apr-18-2008  09:58am   From-SPARROW HO.. ACCOUNTING DEPT       +15173646057       T-278   P.009/019   F-320

5

GME reimbursement through the cost report, using the Provider's internal logs as well as the rejection of the untimely filed Medicare + Choice claims, was proper.

## SUMMARY OF COMMENTS

CMM commented, noting that it agreed with the Board's decision to dismiss St. Lawrence Mercy Hospital from the case on jurisdictional grounds, but disagreed with the Board's findings as to E.W. Sparrow Hospital. CMM stated that there was substantial evidence that the Provider was aware of the requirement to submit the Medicare managed care claims to the Intermediary in UB-92 format, but that it chose not to do so. As evidence of this, CMM cited testimony by the Intermediary's witness, who said she discussed the need for the Provider to submit the UB-92 claims when she noticed during the audit process that the hospital still had time to submit them for the FYE December 31, 1999 cost report. Additionally, CMM noted that the Provider did submit some of the UB-92 claims in both the FYE December 31, 1998 and December 31, 1999 cost reporting periods, which CMM claimed was further evidence of its knowledge of the requirement in question.

CMM noted that the Secretary was given broad authority in implementing the BBA provisions to provide hospitals with supplemental IME and DGME payments for Medicare managed care days. CMS implemented provisions, first through a final rule published in the Federal Register on August 29, 2007, and then through a final rule published on May 12, 1998. The preamble to this later final rule provided explicit notice to hospitals that they would be expected to submit Medicare managed care claims to the Intermediary for IME and DGME payment purposes under part A. in addition to the bills submitted to managed care plans for payment under part C. CMS' Program Memorandum, issued in July 1998, explained that hospitals must submit Medicare managed care claims to the Intermediary in UB-92 format. This was made explicit to the Provider in a monthly Medicare Administrative bulletin that was sent by the Intermediary.

The Board cited the Bulletin as proof that there was no directive that a Provider must bill the Intermediary. CMM pointed out that, while the Intermediary's Medicare Administrative bulletin stated that "teaching hospitals may submit bills for inpatient stays by managed care enrollees for payment of IME," it also specifically said "PPS hospitals must submit a claim to their intermediary in UB-92 format...." CMM argued that this constituted a directive to the Provider that it must bill the Intermediary. Furthermore, CMM argued, while the regulations at 42 CFR 413.76 and 412.105(g) do not include the filing instructions that CMS issued in the Program Memorandum, CMS has historically relied on the issuance of Program Memoranda to implement payment procedures and processes on a subregulatory basis subject to the applicable IME and DGME statutes and regulations.

6

Finally, CMM pointed out that, in a prior decision, the CMS Administrator's decision noted that there was a distinction between claims for services "furnished on a prepaid capitation basis by a health maintenance organization…" (that is, claims associated with Part C) which are exempt from the timely requirements and claims for payments (the supplemental IME and DGME payments for Medicare managed care enrollees under Part A) which are indeed subject to the timely requirements specified in the regulations. Thus, CMM argued, subject to 42 C.F.R. §424.44, the Provider must submit timely UB-92 claims to the Intermediary based on services provided to Medicare managed care patients in order to receive supplemental IME and DGME payments for Medicare managed care enrollees.

The Provider's assertion that the Intermediary can and should use the UB-92 claims submitted late to the Intermediary in order to manually calculate IME and DGME payments for the Medicare managed care enrollees was unreasonable. The UB-92 claims by themselves do not contain all the information necessary to determine accurate payment. Moreover, CMM noted, the use of the Provider's unsubstantiated internal logs does not meet the payment standards in place for Intermediaries. Compelling the Intermediary to manually compute the IME and DGME payments would not be appropriate and would not result in accurate payments. It would also entail a substantial effort on the Intermediary's part to resolve the situation that was precipitated by the Provider when it failed to heed CMS' requirement to submit the Medicare managed care UB-92 claims in a timely manner.

The Provider commented, noting that it did not contest the jurisdictional decision of the Board regarding St. Lawrence Hospital and, thus, the comments were being set forth on behalf of E.W. Sparrow Hospital. The Provider requested that the Administrator affirm the Board's decision based on the arguments made before the Board.

The Provider took issue with CMM's comment that there was substantial evidence to support that the Provider was aware of the requirement for hospitals to submit the Medicare managed care claims to the intermediary in the required UB-92 format. The Provider pointed out that the un-contradicted testimony of a Provider's witness supported its position that the Intermediary had failed to notify the Provider. Further, the Intermediary's witness testified that she did not personally notify the Provider of the requirement, and it was not within her job description to do so. The witness also acknowledged that there was no evidence of her alleged discussion with a former employee of the Provider and that, even if such discussions occurred, they would not have satisfied the Intermediary's notice requirement. She was also unaware of any Intermediary notification process or any indirect evidence that the notice requirement had been satisfied.

Apr-18-2008 11:44am From-SPARROW HO.. ..CCOUNTING DEPT +15173646057 T-279 P.002/002 F-324

7

The Provider also challenged CMM's assertion that the Intermediary made the required notification "on the monthly Medicare administrative bulletin that it regularly sends to all of its providers." The Provider noted that, the Intermediary never made this assertion to the Board, and that there is no evidence in the proceedings conducted by the Board regarding this assertion. Finally, the Provider argued against CMM's assertion that the UB-92 cannot be simulated, noting that the testimony of the Provider's witness supports the Provider's position that it would be possible to simulate the claims. The Intermediary's witness agreed that this would be possible.

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. Comments timely submitted have been included in the record and have been considered.

Until 1983, Medicare paid for covered hospital inpatient services on the basis of "reasonable cost." Section 1861(v)(1)(A) of the Act defines "reasonable cost" as "the cost actually incurred," less any costs "unnecessary in the efficient delivery of needed health services." While §1861(v)(1)(A) does not prescribe specific procedures for calculating reasonable cost, it authorizes the Secretary to promulgate regulations setting forth the methods to determine reasonable cost and the items to be included in reimbursable services.

In addition, Medicare historically has paid a share of the net costs of "approved medical education activities" under the reasonable cost provisions.[6] The Secretary's regulations define approved educational activities as formally organized or planned programs of study, usually engaged in by providers to enhance the quality of care in an institution.[7] The activities include approved training programs for physicians, nurses and certain paramedical health professionals. Under the reasonable cost system, the allowable costs of the activities included: the direct costs of salaries and fringe benefits of interns and residents; the salaries attributable to teaching physicians' supervisory time; other teachers' salaries; and indirect or institutional overhead costs, including employee health and welfare benefits, that were appropriately allocated to the proper cost center on a provider's Medicare cost report.[8]

In 1982, Congress modified the Medicare program to provide hospitals with better incentives to render services more efficiently. Pursuant to the Tax Equity and Fiscal

---

[6] 20 C.F.R. §405.421 (1966); 42 C.F.R. §405.421 (1977); 42 C.F.R. §413.85 (1986).
[7] 42 C.F.R. §413.85(b).
[8] 54 Fed. Reg. 40,286 (Sept. 27, 1989).

Apr-18-2008  09:58am  From-SPARROW HOS, ...COUNTING DEPT          +15173646057          T-278  P.008/019  F-320

8

Responsibility Act (TEFRA),[9] Congress amended the Act by imposing a ceiling on the rate-of-increase of inpatient operating costs recoverable by a hospital. However, under § 1886(a)(4) of the Act, GME costs were excluded from the definition of inpatient operating costs for purposes of the TEFRA base year and, thus, were not included in the hospital's TEFRA base year costs for purposes of determining the hospital's target amount.

In 1983, § 1886(d) was added to the statute to establish an inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital services furnished to Medicare beneficiaries.[10] Under IPPS, providers are reimbursed their inpatient operating costs based on prospectively determined national and regional rates for each patient discharge, rather than on the basis of reasonableness. Graduate medical education costs continued to be paid on a reasonable cost "pass-through."

However, applicable for all periods beginning on, or after, July 1, 1985, pursuant to §1886(h) of the Act,[11] Congress established a new payment policy for DGME costs.[12] Generally, the DGME payment is a combination of a hospital's per resident amount and the hospital's Medicare patient load. The Medicare patient load means, with respect to a hospital's cost reporting period, the total number of hospital inpatient days during the cost reporting period that are attributable to patients for whom payment is made under Medicare Part A divided by total hospital inpatient days. To implement the new payment policy, the Secretary promulgated regulations at 42 C.F.R. §413.86, et seq.

With respect to the indirect costs of teaching programs, section 1886(d)(5)(B) of the Act also provides that teaching hospitals that have residents in approved GME programs receive an additional payment for each Medicare discharge to reflect the higher indirect patient care costs of teaching hospitals relative to non-teaching hospitals. The regulations at 42 C.F.R. §412.105 establish how the additional payment is calculated. The additional payment, known as the indirect medical

---

[9] Pub. L. No. 97-248.

[10] Section 601(e) of the Social Security Amendments of 1983. Pub. L. No. 98-21 (1983).

[11] Section 9202 of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1985, as amended.

[12] 54 Fed. Reg. 40,297 (September 27, 1989). (Revised payment method applies to all hospitals regardless of status under PPS.) See 50 Fed. Reg. 27,722 (July 1985)(Final rule that hospitals would be reimbursed lesser of allowable costs for current year or hospitals' approved GME costs incurred during 1984 FY; nullified by Section 1861(v)(1)(Q) pursuant to Section 9202 of COBRA 1985). Section 9314 of Omnibus Budget Reconciliation Act of 1986 (Pub. L. No. 99-509) added Section 1886(h)(4)(E).

Apr-18-2008  09:59am  From-SPARROW HO.. ..ACCOUNTING DEPT          +15173646057          T-278  P.010/019  F-320

9

education or IME adjustment, is based on the indirect teaching adjustment factor, calculated using the hospital's ratio of FTE residents to beds.  Each hospital's IME payment under the prospective payment system for inpatient operating costs is determined by multiplying the total Diagnosis-Related Group (DRG) revenue for inpatient operating costs by the applicable IME adjustment factor.

Prior to the enactment of the BBA '97, for purposes of the DGME payments, the numerator of the Medicare patient load fraction included only the number of patient days attributable to the Medicare beneficiaries who were entitled to have payment made under the Medicare Part A fee-for-service program.  CMS did not include inpatient days attributable to enrollees in Medicare risk plans (Medicare health maintenance organizations or competitive medical plans with risk sharing contracts under section 1876 of the Act) in the Medicare patient load used to calculate Medicare payment for DGME.   However, Section 4624 of BBA '97 amended the Social Security Act by adding a new provision for DGME payments with respect to patient days attributable to services furnished to Medicare beneficiaries enrolled in a Medicare + Choice plan or any other Medicare managed care plan with a risk sharing contract under section 1876 of the Act.     Section 1886(h)(3) of the Act states that:

> (D) Payment for Managed Care Enrollees.
> (i)  For portions of cost reporting periods occurring on or after January 1, 1998, the Secretary shall provide for an additional payment amount under this subsection for services furnished to individuals who are enrolled under a risk-sharing contract with an eligible organization under section 1876 and who are entitled to part A or with a Medicare + Choice under part C.  The amount of such a payment shall equal the applicable percentage of the product of –
>> (I)  the aggregate approved amount (as defined in subparagraph (B)) for that period; and
>> (II)  the fraction of the total number of inpatient-bed days (as established by the Secretary) during the period which are attributable to such enrolled individuals.
> (ii)  Applicable Percentage – For purposes of clause (i), the applicable percentage is -
>> (I)    20 percent in 1998,
>> (II)   40 percent in 1999,
>> (III)  60 percent in 2000,
>> (IV)   80 percent in 2001… [Emphasis added.]

Similarly, section 4622 of the BBA '97 amended the Social Security Act by adding a new provision at section 1886(d)(11) addressing the IME payment.  This paragraph states:

(11) Additional Payments for Managed Care Enrollees. –
(A) In General. – For portions of cost reporting periods occurring on or
after January 1, 1998, the Secretary shall provide for an additional
payment amount for each applicable discharge of any subsection (d)
hospital that has an approved medical residency training program.
(B) Applicable Discharge – For purposes of this paragraph, the term
"applicable discharge" means the discharge of any individual who is
enrolled under a risk-sharing contract with an eligible organization
under section 1876 and who is entitled to benefits under part A or any
individual who is enrolled with a Medicare + Choice organization
under part C.
(C) Determination of Amount. – The amount of payment under this
paragraph with <u>respect to any applicable discharge</u> shall be equal to the
applicable percentage (as defined in subsection (h)(3)(D)(ii)) of the
estimated average per discharge amount that would otherwise have
been paid under paragraph (5)(B) if the individuals had been enrolled
as described n subparagraph (B).[13] [Emphasis added.]

Thus, for discharges occurring on or after, January 1, 1998, the provisions of the
BBA '97 required the recognition of the Medicare managed care enrollees for
purposes of the IME and DGME payment.

These statutory changes were promulgated in the regulation for the DGME payment
at 42 C.F.R. §413.86 and since recodified at 42 C.F.R. §413.76 (2004). The
regulation at 42 C.F.R. §413.76 states:

A hospital's Medicare payment for the costs of an approved residency
program is calculated as follows:
(a) Step one. The hospital's updated per resident amount (as
determined under Sec. 413.77) is multiplied by the actual number of
FTE residents (as determined under Sec. 413.79). This result is the
aggregate approved amount for the cost reporting period.
(b) Step two. The product derived in step one is multiplied by the
hospital's Medicare patient load.
(c) Step three. For portions of cost reporting periods occurring on or
after January 1, 1998, the product derived in step one is multiplied by
the proportion of <u>the hospital's inpatient days attributable to
individuals who are enrolled under a risk-sharing contract with an
eligible organization</u> under section 1876 of the Act and who are

---

[13] The regulations implementing this provision were codified at 42 C.F.R.
§412.105(g).

entitled to Medicare Part A or <u>with a Medicare+Choice organization under Title XVIII, Part C of the Act</u>. This amount is multiplied by an applicable payment percentage.......[14] [Emphasis added.]

Likewise, for the IME payment, 42 C.F.R. §412.105(g) was amended to state that:

> (g) *Indirect medical education payment for managed care enrollees.* For portions of cost reporting periods occurring on or after January 1, 1998, a payment is made to a hospital for indirect medical education costs, as determined under paragraph (e) of this section, <u>for discharges associated with individuals who are enrolled under a risk-sharing contract with an eligible organization under section 1876 of the Act or with a Medicare+Choice organization</u> under title XVIII, Part C of the Act during the period, according to the applicable payment percentages described in Sec. 413.76(c)(1) through (c)(5) of this subchapter. [Emphasis added.]

The regulation at 42 C.F.R. §412.105(e) explains:

> (1) *Determination of payment amount.* Each hospital's indirect medical education payment under the prospective payment system for inpatient operating costs is determined by <u>multiplying the total DRG revenue</u> for inpatient operating costs, as determined under paragraph (a)(2) of this section, by the applicable education adjustment factor derived in paragraph (d) of this section.[Emphasis added.]

The IME/DGME payment for Medicare managed care enrollees was specifically addressed in the May 12, 1998 <u>Federal Register</u>.[15] which promulgated the IPPS FFY 1998 rule and BBA changes. In response to comments regarding the claims process to be implemented for the DGME and IME payments, the Secretary stated that:

> Under section 4622 and 4624 of the BBA, teaching hospitals may receive indirect and direct GME payments associated with Medicare + Choice discharges. Since publication of the final rule with comment

---

[14] The regulation at 42 C.F.R. §413.75(b) defines the Medicare patient load as: *Medicare patient load* means, with respect to a hospital's cost reporting period, <u>the total number of hospital inpatient days during the cost reporting period that are attributable to patients for whom payment is made under Medicare Part A</u> divided by total hospital inpatient days. In calculating inpatient days, inpatient days in any distinct part of the hospital furnishing a hospital level of care are included and nursery days are excluded. [Emphasis added.]

[15] 63 Fed. Reg. 26,318 (May 12, 1998).

Apr-18-2008 10:00am  From-SPARROW HOS. .COUNTING DEPT        +15173646057        T-278  P.013/019  F-320

12

on August 29, 1997, we have consulted with hospitals, managed care plans, and fiscal intermediaries for purposes of developing a process to implement these provisions.

We anticipate teaching hospitals will need to submit claims associated with Medicare + Choice discharges to the fiscal intermediaries for purposes of receiving indirect and direct medical education payments. When the claims are processed, the fiscal intermediaries will make the IME payment associated with a Medicare + Choice discharge directly to the teaching hospital. Teaching hospitals will also be required to submit bills associated with Medicare + Choice organizations to the managed care plans. The inpatient encounter data from these bills will be submitted by the managed care plans to HCFA for purposes of implementing the risk adjustment methodology. The fiscal intermediaries would revise interim payments to reflect the Medicare direct GME payment associated with Medicare + Choice discharges. However, until the fiscal intermediaries have more experience with paying hospitals for direct GME associated with Medicare + Choice discharges, we believe the fiscal intermediaries will have limited data upon which to base interim payment. We are making adjustments to the Medicare cost report to allow for settlement of the cost report reflective of direct GME payment associated with Medicare + Choice discharges. [Emphasis added.][16]

On July 1, 1998, CMS issued the CMS Program Memorandum (PM) A-98-21[17] was issued, consistent with the claims process that was set forth in the rule. The PM stated that:

This Program Memorandum outlines intermediary and standard system changes needed to process requests for IME and DGME supplemental payments for Medicare managed care enrollees. Sections 4622 and 4624 of the Balanced Budget Act of 1997 state that hospitals may now request a supplemental payment for operating IME for Medicare managed care enrollees. During the period January 1, 1998 through December 31, 1998, providers will receive 20 percent of the fee for service DGME and operating IME payment. This amount will increase 20 percent each consecutive year until it reaches 100 percent.

Moreover, PM A-98-21 further explained that:

---

[16] 63 Fed. Reg. 26,342
[17] See Intermediary's Position Paper, Exhibit I-1.

13

PPS hospitals <u>must</u> submit a claim to the hospitals' regular
intermediary in UB-92 format, which condition codes 04 and 69
present on record type 41, fields 4-13, (form locator 24-30). Condition
code 69 is a new code recently approved by the National Uniform
Billing Committee to indicate that the claim is being submitted for
operating IME payment only.  [Emphasis added.]

The submission of claims to intermediaries for, <u>inter alia</u>, Part A payment, is
controlled by the regulation at 42 C.F.R. §424.30. The regulation explains the scope
of claims for payment and states:

This subpart sets forth the requirements, procedures, and time limits
for claiming Medicare payments.  Claims must be filed in all cases
except when services are furnished on a prepaid capitation basis by a
health maintenance organization, (HMO), a competitive medical plan
(CMP), or a health care prepayment plan (HCPP).

Therefore, while claims for, <u>inter alia</u>, Part C managed care services are not
controlled by this section, a hospital must submit  claims in conformity with 42
C.F.R §424.30, <u>et seq.</u>, to be able to include managed care enrollees for the Part A
IME and DGME payments from its intermediary.  The timeframe for filing claims is
set forth at 42 C.F.R. §424.44, which states that:

(a) *Basic limits*. Except as provided in paragraph (b) of this section, the
claim must be mailed or delivered to the intermediary or carrier, as
appropriate –
(1) On or before December 31 of the following year for services that
were furnished during the first 9 months of a calendar year; and
(2) On or before December 31 of the second following year for
services that were furnished during the last 3 months of the calendar
year.
(b) Extension of filing time because of error or misrepresentation.
(1) The time for filing a claim will be extended if failure to meet the
deadline in paragraph (a) of this section was caused by error or
misrepresentation of an employee, intermediary, carrier, or agent of the
Department that was performing Medicare functions and acting within
the scope of its authority.
(2) The time will be extended through the last days of the 6th calendar
month following the month in which the error or misrepresentation is
corrected.

As the PM explained, filing a claim with the intermediary using the UB-92 form is
required in order to generate data that may be used for payment. The procedures set

14

forth in the PM are consistent with the Medicare Financial Management Manual (Pub. 100-6), which explains the role of the UB-92 form and claims processing in the settlement process. The claims system makes the required determination on eligibility rules and benefits available for Medicare, in contrast to the cost report settlement process. CMS provides each intermediary with a standard Provider Statistical and Reimbursement System or the "PS&R" to interface with billing form CMS 1450 (UB-92 form). This system provides reports to be used in developing and auditing provider cost reports and related data accumulation operations. Providers also must use the reports in preparing cost reports and must be able to explain any variances between the PS&R report and the cost report. The intermediary uses information on such items as Medicare patient days (relevant for GME), discharges, and DRGs. The statistical reports produced are the Payment Reconciliation Report; Provider Summary Report, and DRG Summary Report. Thus, when a provider bills in accordance with the instructions for payment of the DGME and IME for Medicare managed care enrollees, the claims system would compute a simulated DRG payment and charges for patient days and issue a payment, all of which would be summarized on the PS&R. The CMS PM-A-98-21 explained that:

> The intermediary will submit the claim to the Common Working File (CWF). CWF will determine if the beneficiary is a managed care enrollee and what their plan number and effective dates are. Upon verification from the CWF that the beneficiary is a managed care enrollee, the intermediary will add the HMO Pay code of 0 to the claim and make an operating IME only payment with the proper annotation of the remittance advice....
> The DGME payments are to be made using the same interim payment calculation you currently employ. Specifically, you must calculate the additional DGME payments using the inpatient days attributable to Medicare managed care enrollees. As with DGME payments under fee-for-service, the sum of these interim payment amounts are subject to adjustment upon settlement of the cost report.

Reporting costs on the cost report alone is not sufficient to seek a DGME and IME payment for managed care enrollees. If no claim is filed, no IME payment will be made, and no data relating to days will be generated on the PS&R that can be reconciled with the reported cost report amounts for purposes of the GME.

In this case, the Provider argued that the Intermediary failed to notify them of the reporting requirements contained in PM A-98-21. The Provider contended that due to this failure, it did not submit the requisite UB-92 forms and the PS&R did not reflect data for all of the Medicare managed care enrollees. The Provider also argued

Apr-18-2008 10:01am  From-SPARROW HO., ACCOUNTING DEPT        +15173646057        T-278  P.016/019  F-320

15

that the UB-92 filing requirement is not supported by the enabling statutes, nor regulation.

However, the Administrator finds that, while the statute did not set forth in detail that the Provider was to submit data directly to the Intermediary, the provision for this payment for managed care enrollees is within the framework of a pre-existing methodology for Medicare Part A IME/DGME payments. The fiscal intermediaries are responsible for determining payments under Medicare Part A pursuant to Section 1816 of the Act. The pre-existing IME/DGME methodology requires that claims be made to the intermediary in order to generate a payment and for the related data to be captured on the PS&R. The May 1998 preamble language published in the Federal Register anticipated this requirement.  In addition, the PM A-98-21 explicitly stated that a "hospital must submit a claim to the hospital's regular intermediary." The record shows that the Intermediary issued a Medicare Memo (Memo), dated March 11, 1999. This Memo stated that in order to bill for IME supplemental payment, "PPS hospitals must submit a claim to their intermediary in UB-92 format..."[18]

The Federal Register preamble language, the PM A-98-21, and the Memo plainly instructed providers to bill their intermediary so that the claims could be processed for the additional IME and DGME payments.  The Administrator finds that providers were informed of the billing policy as early as the May 1998 Federal Register publication that hospitals would be required to file claims for payment with their intermediary. The record supports that the Provider was also given actual notice in the memorandum from the Intermediary, well prior to the date any claims were required to be filed.[19]

---

[18] See Intermediary's Position Paper, Exhibit I-2.
[19] The Provider challenged the testimony of an Intermediary representative stating that she did not personally notify the Provider of the new reporting policy, nor did the Intermediary have documentation to show that the Provider did receive the Memo.  However, the record shows that the Intermediary's Memo was sent out generally to all providers, to educate them about the Program Memorandum as a standard business practice.  The witness explained that they do not send certified mail for this type of general documentation. (See Tr. at 81).  The witness further explained that she had spoken with a Provider's staff member, expressing her concern of the low billing days in comparison to other institutions. She testified that the Provider's staff member responded that they were aware they needed to bill, but because the hospital was in the midst of a merger they did not have time as they were busy with other priorities. (See Tr. at 90).  Consequently, the Administrator finds substantial evidence in the record to support a finding that the Provider had actual notice of the processing procedures.

Apr-18-2008 10:01am From-SPARROW HOSP ..JOUNTING DEPT        +15173646057        T-278  P.017/019  F-320

16

The Administrator also finds that the APA does not require CMS to publish a new regulation under these circumstances. CMS is allowed to promulgate interpretive rules and guidance. The payment of IME/DGME was an already established payment methodology for teaching hospitals that was already linked to the claims processing system. In addition, consistent with the APA, the proposed claims processing methodology was published in the May 1998 Federal Register subject to notice and comment. Finally, the record supports a finding that the Intermediary gave actual notice to the Provider discussing the right to payments for both IME and DGME payments and how the claims were to be billed.[20] The claims processing instructions implementing the IME/DGME payment was not contrary to the requirements of the APA.

The IME and DGME payment for Medicare managed care discharges was effective for portion of cost reporting periods beginning on, or after, January 1, 1998. The PM A-98-21 was issued by CMS on July 1, 1998. Pursuant to 42 C.F.R. §424.44, the earliest claims were due on or before December 31 of the following year for services that were furnished during the first 9 months of a calendar year. The Provider had adequate time to comply with CMS' instruction requiring the submission of the specially coded UB-92 billing forms. Thus, the Provider had approximately 15 months after notice of the change in policy that allows a hospital to submit claims for IME/DGME payment for Medicare managed care enrollees.

Furthermore, the Provider claimed that it could not comply with the requirement to submit the UB-92 forms because it was not aware of the requirement. However, the record shows that the Provider did in fact submit some UB-92 forms to the Intermediary in the fiscal years ending December 31, 1998 and December 31, 1999. The Provider's PS&R showed that Medicare managed care claims had been submitted, totaling 17 days for FY 1998 and 967 days for FY 1999.[21] The record shows that the Intermediary adjusted the Provider's cost reports for FY 1998 and FY 1999 to reimburse the Provider for supplemental GME and IME payments for Medicare managed care discharges or patient days as provided for in the BBA. The Administrator finds that the Provider's claim to ignorance of the billing requirement is contradicted by the evidence on its PS&R reports, showing that managed care claims had been submitted.

Moreover, the requisite claims were reasonably required to be submitted to the Intermediary pursuant to 42 C.F.R. §424.30. The only exception to the claims processing requirements at 42 C.F.R. §424.30 is for services furnished on a prepaid capitation basis to the beneficiary by a managed care plan, which is not at issue here. The claims in the instant case were claims for an established reimbursement

---

[20] See, n. 19.
[21] See, Provider's Position Paper, Exhibits P-1, P-2, P-8, P-9.

Apr-18-2008  10:02am   From-SPARROW HOS. .CCOUNTING DEPT          +15173646057          T-278   P.018/019   F-320

17

methodology for hospitals' costs associated with being a teaching hospital and not for the services furnished to a managed care enrollees.

Requiring a standard claim format, which determines whether the claim belongs in the calculations, is also a reasonable method of implementing the requirements of the BBA '97 for submitting information. The Administrator finds that the PM A-98-21 was an appropriate means to implement program payments pursuant to the applicable IME and DGME statutory provisions and regulations. The Secretary has the responsibility of ensuring proper program payments to providers of services, and utilizes various processes such as the issuance of regulations and manual instructions, as well as program memorandums. CMS notified its intermediaries and the public regarding the claims processing instructions for the Medicare managed care enrollees IME and DGME payments. The standard claim format is reasonably required as the claims must be reflected in the PS&R. The PS&R is the benchmark against which intermediaries and providers reconcile cost reports in the settlement process.[22]

Accordingly, the Administrator finds that the Intermediary properly determined DGME and IME payments with respect to discharges of Medicare beneficiaries who were enrolled in the Medicare + Choice or other Medicare risk plans.    Thus, the Administrator reverses the Board's decision.

---

[22] The Provider asserted that the Medicare risk plans (not providers) submitted UB-92 data relating to Medicare risk plan discharges to the Intermediary before the audits of each of the fiscal years at issue were completed and the Intermediary did not include that data in the settled cost reports, which the Board Majority accepted as relevant. However, the "encounter data" required by the BBA to be submitted to CMS is related to the risk adjustment methodology and not to a claims determination process required of the IME/DGME payment methodology.

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.

## THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES

Date: 4/14/08

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2008-D17

| | |
|---|---|
| **PROVIDER –**<br>Sparrow Health 98-99 IME Managed Care Group | **DATE OF HEARING –**<br>August 25, 2005 |
| **Provider Nos.:  Various**<br>(See Attached Schedule of Providers) | **Cost Reporting Periods Ended -**<br>December 31, 1998 and December 31, 1999 |
| **vs.** | |
| **INTERMEDIARY –**<br>BlueCross BlueShield Association/<br>United Government Services | **CASE NO.:  04-0088G** |

## INDEX

| | Page No. |
|---|---|
| Issue........................................................................................................... | 2 |
| Medicare Statutory and Regulatory Background............................................ | 2 |
| Statement of the Case and Procedural History.............................................. | 3 |
| Parties' Contentions...................................................................................... | 4 |
| Findings of Fact, Conclusions of Law and Discussion.................................. | 4 |
| Decision and Order........................................................................................ | 9 |
| Dissenting Opinion of Elaine Crews Powell.................................................. | 10 |

ISSUE:

Whether the Providers are entitled to receive additional indirect medical education (IME) and direct graduate medical education (DGME) payments for Medicare managed care enrollees for fiscal years ended December 31, 1998 and 1999.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a health care provider.

The Medicare program provides health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with the program's administration. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due providers under Medicare law and interpretative guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo (a); 42 C.F.R. §405.1835.

This case involves Medicare share of costs for medical education.

Section 1886(h) of the Social Security Act (Act) prescribes the Medicare payment method for direct GME costs. 42 U.S.C. §1395ww(h). In brief, the direct GME payment is the product of a hospital's average per resident amount, derived and updated from a 1984 base period, times the hospital's number of interns and residents in approved GME programs during the payment year, times the hospital's Medicare patient load.

The Act at section 1886(d)(5)(B) provides that teaching hospitals that have residents in approved GME programs receive an additional payment for each Medicare discharge to reflect the higher indirect patient care costs of teaching hospitals relative to non-teaching hospitals. Regulations at 42 C.F.R. §412.105 establish how the additional payment is calculated. The additional payment, known as the IME adjustment, is based on the indirect teaching adjustment factor, calculated using the hospital's ratio of full-time equivalent (FTE) residents to bed.

Page 3                                                                                  CN: 04-0088G

Prior to the enactment of the Balanced Budget Act of 1997 (BBA '97), the numerator of the Medicare patient load fraction included only the number of patient days attributable to the Medicare beneficiaries who were entitled to have payment made under the Medicare Part A fee-for-service program. CMS did not include inpatient days attributable to enrollees in Medicare risk plans (i.e., Medicare Health Maintenance Organizations (HMOs) or Competitive Medical Plans (CMPs) with risk sharing contracts under section 1876 of the Act). In 1989, when CMS promulgated the regulations implementing the prospective payment method for GME, the agency determined that these Medicare managed care plan days would not be counted as Medicare days in the Medicare patient load used to calculate Medicare payment for GME.[1]

Section 4624 of BBA '97 amended the DGME statute by adding a new provision in section 1395ww(h)(3)(D) for an additional GME payment with respect to patient days attributable to services furnished to Medicare beneficiaries enrolled in a Medicare + Choice plan or any other Medicare managed care plan with a risk sharing contract under section 1876 of the Act. The regulations implementing this provision were codified at 42 C.F.R. §413.86. Similarly, BBA '97 amended the IME statute by adding a new provision in 42 U.S.C. §1395ww(d)(5)(B). The regulations implementing this provision are set forth in 42 C.F.R. §413.105(g).

In addition, CMS issued Program Memorandum, HCFA Pub. 60A (Transmittal No. A-98-21), dated July 1, 1998, to its intermediaries. In part, the memorandum explained that hospitals could request the supplemental medical education payments; that hospitals would need to submit specifically coded Medicare claims (in UB-92 form) to receive the payments; and, that intermediaries were to notify their providers, electronic billing associations, and clearinghouses of the reporting requirement within three business days after receipt of the electronic copy of the Program Memorandum.[2]

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

E.W. Sparrow Hospital and St. Lawrence Mercy Hospital (Providers) are short-term, acute care teaching hospitals located in Lansing, Michigan. As teaching hospitals with approved medical education training programs, the Providers appropriately claim reimbursement for costs associated with both IME and DGME. Health Care Service Corporation (Intermediary)[3] reviewed E.W. Sparrow Hospital's cost reports for its fiscal years ended December 31, 1998 and 1999, and St. Lawrence Mercy Hospital's cost report for its fiscal year ended December 31, 1998. As part of these reviews, the Intermediary adjusted the Providers' Medicare settlement data statistics (patient days, discharges, interim payments, etc.) to agree with data captured in the Provider Statistical and Reimbursement Report (PS&R). However, the Providers concluded that the PS&R did not include data all of their Medicare managed care enrollees and that their Medicare reimbursement for IME and DGME was, therefore, understated. According to the

---

[1] 54 Fed. Reg. 40286, 40294-95 (Sept. 29, 1989).
[2] Exhibit I-3.
[3] United Government Services subsequently replaced the Health Care Service Corporation as the Providers' intermediary.

CN: 04-0088G

Providers, the PS&R did not include the data for all Medicare managed care enrollees because they had not submitted the specifically coded UB-92 billing forms required by Program Memorandum (PM) A-98-21 on a timely basis, and the Intermediary rejected their request to accept a late filing of those bills.[4]

The Providers appealed the Intermediary's Medicare settlement data adjustments to the Board pursuant to 42 C.F.R. §§405.1835-405.1841. The amount of Medicare funds in controversy is approximately $527,000.

The Providers were represented by Kenneth R. Marcus, Esq. of Honigman, Miller, Schwartz and Cohn, LLP. The Intermediary was represented by Bernard M. Talbert, Esq., Associate Counsel, Blue Cross Blue Shield Association.

PARTIES' CONTENTIONS:

The Providers contend that the Intermediary failed to notify them of the reporting requirements contained in PM A-98-21; therefore, they did not submit the requisite UB-92s and the PS&R did not reflect data for all of the Medicare managed care enrollees. The Providers also contend that the UB-92 filing requirement is not supported by the enabling statutes or by regulation. However, all of the information necessary for the Intermediary to reimburse the Providers the IME and DGME amounts to which they are entitled is available. In addition, the Providers assert that even if the Intermediary's claims processing system cannot accept the UB-92s that are beyond the claims timeliness requirements of 42 C.F.R. §424.44, the UB-92 payment calculation can be simulated.[5]

The Intermediary contends that it maintained a process to advise its providers of the program memorandum's requirements, and that it was unaware of complaints by any other hospitals it serviced that they had not been advised of the UB-92 reporting requirement. The Intermediary's witness testified that because the Providers were in the process of merging their operations in 1998, that they elected not to submit the Medicare managed care UB-92s due to other priorities.[6] The Intermediary also contends that it is not possible to accurately simulate the DRG payment calculation. The DRG payment determination is made through the Intermediary's claims processing system, and because this system is updated every year, the payment information applicable to the subject cost reporting periods, specifically the PRICER, are no longer maintained or available in the system.[7]

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After consideration of Medicare law and guidelines, parties' contentions, and evidence presented, the Board finds and concludes as follows:

---

[4] Transcript (Tr.) at 21.
[5] Providers' Supplemental Position Paper at 6. Providers' Post Hearing Brief at 15.
[6] Tr. at 58-59.
[7] Tr. at 72-74.

The Providers in this case, St. Lawrence Mercy Hospital and E.W. Sparrow Hospital, essentially challenge the number of patient days and discharges used by the Intermediary to determine the additional DGME and IME reimbursement they could receive pursuant to sections 4622 and 4624 of the Balanced Budget Act of 1997. The Board finds that it does not have jurisdiction over St. Lawrence Mercy Hospital's challenge and it is, therefore, dismissed from the case. Regarding E.W. Sparrow Hospital, the Board majority finds that the Intermediary used the incorrect number of Medicare managed care discharges/patient days to determine the Provider's additional IME and DGME reimbursement.

Upon review of the Providers' cost reports, the Board finds that St. Lawrence Mercy Hospital had not claimed any Medicare managed care discharges/patient days in its 1998 cost report nor did it claim additional reimbursement for IME and DGME pursuant to the BBA '97 (See, Form CMS-2552-96, Worksheet S-3, Part I, Line 2, and Worksheet E, Part A, Lines 1.03-1.05). Moreover, a review of its audited and final settled 1998 cost report shows that the Intermediary made no adjustments to these statistics. Therefore, the Board does have jurisdiction over St. Lawrence Mercy Hospital's 1998 cost report pursuant to 42 U.S.C. 1395oo and 42 C.F.R. §405.1835. Except in limited circumstances not relevant here,[8] these authorities contemplate that a final determination be made by an intermediary as a prerequisite to Board jurisdiction. Here, the Intermediary made no such determination with respect to the Medicare managed care discharges/patient days because the hospital did not claim reimbursement for all costs to which it is entitled to be reimbursed. Therefore the hospital cannot, on appeal to the Board, first ask for new costs. Little Company of Mary Hospital Health Care Centers v. Shalala, 24 F.3d 984 (7th Cir. 1994).[9]

With respect to E.W. Sparrow Hospital, the Board majority finds that the Provider also did not claim Medicare managed care discharges/patient days in the cost reporting periods at issue nor did it claim additional IME and DGME reimbursement pursuant to the BBA '97. However, the Intermediary did adjust (increase) the Provider's Medicare managed care statistics and the IME and DGME reimbursement pursuant to the BBA '97. Accordingly, final determinations with respect to Medicare managed care days and discharges, although positive in nature with respect to the Provider's program payments, were rendered by the Intermediary thereby meeting the jurisdictional requirements of the regulations.

---

[8] See, e.g. Bethesda Hospital Association v. Bowen, 485 U.S. 399 (1988).

[9] The Board acknowledges the Provider's argument that jurisdiction should not be denied because its appeal stems from the Intermediary's use of flawed data contained in its own PS&R; that is, Intermediary data that did not contain the correct number of Medicare discharges and patient days (See, Provider correspondence dated July 25, 2006, in response to Board inquiry). In effect, the Provider asserts that it was required to use the Intermediary's Medicare managed care data to prepare its cost report and that its appeal rights should therefore be upheld. The Board disagrees with the Provider's representation. Instructions for preparing Medicare cost reporting forms contained in CMS Pub. 15-2 require all providers to complete and submit a Provider Cost Report Questionnaire, Form CMS-339. Section 1102.3 K of the questionnaire explains that providers may use the PS&R as the source document to complete their cost reports or that they may use their own internal records.

Page 6                                                        CN: 04-0088G

Based upon the merits of E.W. Sparrow Hospital's appeal, the Board majority finds that the Balanced Budget Act of 1997 provided for IME and DGME payments for services provided under risk health maintenance organization (HMO) contracts that had not previously been available. The Secretary of the Department of Health and Human Services (Secretary) was given broad authority to provide for or devise a way to pay hospitals supplemental payments for DGME and IME. §1395ww(h)(3)(D) entitled Payment for managed care enrollees states:

> (i) In general. For portions of cost reporting periods occurring on or after January 1, 1998, the Secretary shall provide for an additional payment amount under this subsection for services furnished to individuals who are enrolled under a risk-sharing contract with an eligible organization under section 1395mm of this title and who are entitled to part A of this subchapter or with a Medicare + Choice organization under part C of this subchapter.

1395ww(d)(11) entitled Additional payments for managed care enrollees states:

> (A) In general.— For portions of cost reporting periods occurring on or after January 1, 1998, the Secretary shall provide for an additional payment amount for each applicable discharge of any subsection (d) hospital that has an approved medical residency training program.

Therefore, the question to be decided is what conditions precedent must be satisfied to entitle a hospital to payment for the new additional benefit. Prior to the BBA '97, whether a "claim" (described elsewhere as a form UB-92) was required to be filed for each patient stay was governed by 42 C.F.R. § 424.30 which states:

> This subpart sets forth the requirements, procedures, and time limits for claiming Medicare payments. Claims must be filed in all cases except when services are furnished on a prepaid capitation basis by [HMOs].

42 C.F.R. §424.32 et. seq. furnishes more detail including the "basic requirements" for filing all claims including the requirement that the claim be filed with the hospital's intermediary and within the time limits specified in section 424.44.

Therefore, prior to the BBA '97, in order to receive payment for the services furnished to Medicare beneficiaries, the hospital filed its claim for payment directly with the Medicare intermediary. But if the beneficiary was a member of a risk HMO which had been prepaid by Medicare, the hospital filed its claim for payment for services furnished with the HMO, not the intermediary. The Board majority finds that the claims in question were for services furnished by and paid for by Medicare + Choice organizations or other Medicare risk plans, and therefore, they are specifically exempt from the requirements,

CN: 04-0088G

procedures and time limits under this section. The information that would be needed to
process these claims by intermediaries is contingent upon the Medicare HMO plans'
payment processing methods which are entirely disparate from the fee-for-service plan.
In addition, prior to the BBA '97, despite the process for filing claims for payment for
*services furnished*, hospitals were nevertheless required by the hospital manual to file
"no-pay" bills for tracking or utilization purposes only, for example, to set capitated rates.
These were referred to as "no-pay" bills and the data assembled was referred to as
"encounter data."

> A. <u>No-Payment Situations Where Bills Must be Submitted</u>.--
> Situations for which bills are required include the
> following. If part of the admission will be paid and part not,
> prepare one bill covering the entire stay ...
>
> * * * * *
>
> For services provided to an HMO enrollee for which an
> HMO has jurisdiction for payment. Since HCFA is
> instructing you to provide this information, negotiate an
> agreement with the HMO for submitting to it bills it pays.
> Include in your agreement with HMOs a clear statement of
> the data elements required for proper identification of
> Medicare HMO/CMP enrollees and accurate submission to
> the intermediary.
>
> Where the HMO does not have jurisdiction, prepare a
> payment bill.

CMS Program Manuals - Hospital (PUB. 10), Chapter IV - Billing Procedures
411. Submitting Inpatient Bills In No-Payment Situations.

The Balanced Budget Act of 1997 and the Secretary's implementing regulations clearly
shifted the burden for filing encounter data squarely to the risk HMOs.

> In order to carry out this paragraph, the Secretary shall
> require Medicare + Choice organizations (and eligible
> organizations with risk-sharing contracts under section
> 1395mm of this title) to submit data regarding inpatient
> hospital services for periods beginning on or after July 1,
> 1997, and data regarding other services and other
> information as the Secretary deems necessary for periods
> beginning on or after July 1, 1998. The Secretary may not
> require an organization to submit such data before January
> 1, 1998.

42 U.S.C. §1395w-23(a)(3)(B).

Page 8                                                                CN: 04-0088G

> Data collection: Basic rule. Each M+C organization must
> submit to CMS (in accordance with CMS instructions) all
> data necessary to characterize the context and purposes of
> each encounter between a Medicare enrollee and a
> provider, supplier, physician, or other practitioner.

42 C.F.R. §422.257(a) (interim final rule was published in June 1998). No changes were
made to 42 C.F.R. §424.30. Furthermore, neither the regulatory changes implementing
the new IME/DGME payment nor any other regulation gave notice that hospitals would
now be required to file a separate IME/DGME claim with the intermediary that was
virtually identical to the claim filed with the HMO to recover payment for inpatient
services.

When 42 C.F.R. §424.30 governing claims filing was implemented, there was no
contemplation of or any need for a "claim for payment" other than the claim to obtain
payment for the inpatient *services furnished* to the beneficiary. When the additional
payment for IME/DGME was authorized by the BBA '97, it did not change the nature of
the payment for "services furnished." Rather, the Board majority finds that the
IME/DGME payment arises from "services . . . furnished on a . . . capitation basis . . ."
for which filing a claim *with the intermediary* is excepted under 42 C.F.R. § 424.30.

The Secretary has been given extremely broad authority to implement procedures for
payment. However, once the system was established by regulation linking the obligation
to file an intermediary claim with the method of payment, CMS' effort to impose a
contrary claims filing requirement via guidance in an Administrative Bulletin is
insufficient to deprive a provider of its statutory right to payment. The Administrative
Bulletin issued by the Intermediary on August 6, 1998 states that "teaching hospitals
may submit bills for inpatient stays by managed care enrollees for payment of IME".
This bulletin only addressed "IME cost" payments and did not specify a definite date
when this billing should begin or make any reference to PM A-98-21 for further
guidance.

Nowhere does the Board majority find a directive to the Provider that states that in order
to receive IME and DGME supplemental payments a provider *must* bill the intermediary.
The Administrative Bulletin simply states that you "may" bill.

Despite the fact that CMS had a very short timeframe to implement the provisions of the
BBA '97, specifically, for the issue in question by the effective date of January 1, 1998,
CMS should have followed the Administrative Procedures Act (APA) prescribed
"informal rulemaking" process and made provisions to handle the period from January 1,
1998 until the finalization of the rule. If the regulatory obligation to file a "claim" is to
be bifurcated so that a provider has an obligation to file its claim for payment of services
to the beneficiary with the HMO and to also file a virtually identical claim to the
intermediary, then the Board majority believes that a regulatory notice is required. For
these reasons, the Board majority finds that the Intermediary's disallowance of the

subject Medicare managed care discharges/patient days, based on the fact that the Provider did not bill and the data was not captured on the PS&R, is without basis.

Finally, the Board majority is unpersuaded by the Intermediary's argument that a claim filed in UB-92 format is essential to determining a proper payment amount. For the period from 1/1/98 up until the date of notice, the option to bill and receive an interim payment was not available, and the use of an alternate method was necessary to allow providers to make a request (or claim) for these payments. The Provider has the information necessary for the Intermediary to pay the Provider the IME and DGME amounts to which it is entitled.[10] The case must be remanded to the Intermediary to complete the audit of this data.

## DECISION AND ORDER:

The Board does not have jurisdiction over St. Lawrence Mercy Hospital's challenge and it is, therefore, dismissed from the case.

E.W. Sparrow Hospital is entitled to receive additional IME and DGME payments for Medicare managed care enrollees for its fiscal years ended December 31, 1998 and 1999. The case is remanded to the Intermediary to include the days applicable to the Medicare + Choice enrollees.

## Board Members Participating:

Suzanne Cochran, Esq.
Elaine Crews Powell, C.P.A. (Dissenting)
Anjali Mulchandani-West, C.P.A.
Yvette C. Hayes

## FOR THE BOARD:

Suzanne Cochran, Esq.
Chairperson

## DATE:  FEB 1 2 2008

---

[10] Provider's Position Paper at 3. Provider's Supplemental Position Paper at 6. Tr. at 33-35.

Dissenting Opinion of Elaine Crews Powell

The majority asserted jurisdiction over the Medicare + Choice (M+C) discharges/days that E. W. Sparrow Hospital failed to claim on its as-filed cost reports for the years in issue. I dissent.

I find support for my position in the Medicare statute that governs the Provider Reimbursement Review Board, SSA 1878(d), which reads as follows:

> A decision by the Board shall be based upon the record made at such hearing, which shall include the evidence considered by the intermediary and such other evidence as may be obtained or received by the Board, and shall be supported by substantial evidence when the record is viewed as a whole. The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters **covered by such cost report** (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination. (Emphasis added)

Since no statute, regulation or program instruction prevented the Provider from seeking reimbursement for the additional IME and GME costs related to its M+C patients, I find that its failure to do so results in the unclaimed discharges/days not being "covered by the cost reports" in issue. The Board and Courts have come to a similar conclusion in several other cases.[11] Furthermore, allowing a provider to first assert its claim for reimbursement through the appeal process renders meaningless the Program's requirement that accurate cost reports be filed timely, because it effectively results in leaving cost reports open well past the deadline for their submission.

Despite my jurisdictional finding, I will, nevertheless, orate regarding the facts in this case in order to make my position on the substantive issue clear for the reviewers of the majority's decision.

The majority found that the Intermediary improperly excluded some of the Provider's Medicare managed care discharges/days from the calculation of additional IME and GME reimbursement authorized by §§ 4622 and 4624 of the BBA of 1997. I respectfully disagree.

Fundamentally, I find that Transmittal No. A-98-21 was an appropriate means by which to implement program payments provided for in the applicable IME and GME statutes and regulations. I also find that the requisite claims for the additional reimbursement

---

[11] See, Maple Crest Care Center, PRRB Decision 2003-D4 (November 7, 2002); dec'd. rcv. CMS Admr. (January 9, 2003), wherein the Board denied jurisdiction over unclaimed bad debts citing Little Company of Mary Hospital Health Care Centers v. Shalala, 24 F.3d 993 (7th Cir. 1994.). See also, Athens Community Hospital v. Schweiker, 743 F.2d 1 (9th Cir. 1984); Battle Health Services v. Leavitt, 498 F.3d 401 (6th Cir. 2007).

were not exempt from submission to the Intermediary pursuant to 42 C.F.R. § 424.30 and that these claims were not claims for services "furnished on a prepaid capitation basis by a health maintenance organization..." as envisioned by that section. Rather, the claims were "claims for payment" for the additional IME and GME reimbursement due the Provider because of its medical education activities; thus, they were subject to the timely filing requirements of 42 C.F.R. § 424.44.

CMS is responsible for ensuring proper program payments to providers who furnish services to Medicare beneficiaries. Under its broad authority to accomplish this mandate, CMS employs various vehicles and prescribes various processes. These include the issuance of regulations and manual instructions as well as program memorandums and transmittals. CMS notified intermediaries and the public regarding the availability of the additional reimbursement for Medicare managed care enrollees when it formally modified the IME and GME regulations via a final rule published on August 29, 1997 (See, 62 Fed. Reg. 45565, 45968-45969). CMS' publication of Transmittal A-98-21 instructed intermediaries to notify their hospitals of the right to request the additional payments and the means by which the payments could be secured.

Contrary to the Board majority's opinion, I find that there was no need for CMS to publish a new regulation with the required notice and comment period. CMS clearly intended to get the additional reimbursement to teaching hospitals as soon as possible, and I find that the use of a transmittal was a well-established, efficient way to do so. Intermediaries have processes in place to manage the receipt of information and instructions from CMS and for the dissemination of that information to their affected providers. Nothing in the record indicates that this process was not in place at the Provider's intermediary.

The Provider maintains that it did not receive timely notice of the requirement to file the specially coded UB-92 claim forms, but there is uncontroverted evidence in the record demonstrating that the Provider had definitive notice of the requirement as early as March 11, 1999.[12] While the Intermediary was unable to prove with contemporaneous documentation that it specifically notified Sparrow of the billing requirement before that date, I find credible the Intermediary witness's testimony[13] that she discussed the billing requirement with the Provider's staff prior to the March 1999 Medicare Memo, that Provider's staff person responded that the hospital was in the process of merging with St. Lawrence Hospital and decided not to bill because other priorities took precedence.

The record shows that the Provider, in fact, billed 17 days for services rendered in FYE 12/31/98 and 967 days in the FYE 12/31/99. Evidence of these billings is reflected in the Intermediary's PS&R which led to positive adjustments being made to the Provider's cost reports. The Provider now seeks to claim additional, unbilled M+C days of 3,406 for FYE 12/31/98 and 3,725 for FYE 12/31/99 and maintains that it can compute accurate payment of additional IME costs based on its internal records of the DRGs it assigned to

---

[12] See, Intermediary Exhibit I-2 - United Government Services' Medicare Memo dated March 11, 1999.
[13] Tr. pgs. 58-59 and 90.

the inpatient stays of M+C patients.[14]  I agree with the Intermediary's contention that reimbursement of unprocessed claims cannot result in accurate payment because the pricer program for the FYEs in issue has been purged from claims payment system.[15] The evidence shows that the Provider eventually submitted claims for the additional IME and GME reimbursement after the claims filing deadline had passed.  The Intermediary rejected these claims as untimely.[16]

To the extent that the Provider ignored the Program's claims filing requirement, it did so to its detriment.  Its numerous arguments are, at bottom, aimed at shifting the burden for ensuring accurate IME and GME reimbursement to the Intermediary.  I find that the Provider was responsible for claiming all the reimbursement to which it was entitled and that it received timely notification of the manner in which that reimbursement could be secured – the timely filing of properly coded UB-92 claim forms.

The Intermediary's refusal to compute the additional IME and GME reimbursement through the cost report using the Provider's internal logs as well as the rejection of untimely filed M+C claims was proper.


*Elaine Crews Powell*

Elaine Crews Powell, CPA

---

[14] Tr. pgs. 49-51, 75. The Provider's calculation of the amount in controversy for IME was based on an "average" DRG associated with discharges of M+C enrollees and it used the 2005 pricer program to cost out its claims.
[15] Tr. pgs. 72-73.
[16] Tr. pgs. 47-48.

ATTACHMENT

Schedule of Providers

PRRB Case No. 04-0088G

| Provider | Provider Number | Cost Reporting Periods |
|---|---|---|
| E.W. Sparrow Hospital | 23-0230 | December 31, 1998 and 1999 |
| St. Lawrence Hospital | 23-0157 | December 31, 1999 |

## Final Decision Review and Appeal Information

The Provider Reimbursement Review Board's (Board) decision
becomes final 60 days after the date of receipt by the provider
unless within that time the Administrator of HCFA notifies the
parties of an action taken under the provisions of 42 C.F.R.
§ 405.1875.  If such action is taken, then the Administrator's
decision becomes final 60 days after receipt thereof by the
provider.

Providers are permitted to initiate two actions within specified
time limits.  First, the provider (and/or the intermediary) may
request the Administrator to review a Board decision within 15
days of its receipt.  (See § 405.1875(b)).  Secondly, Section
1878(f) of the Social Security Act ("Act"), 42 U.S.C.
§ 1395oo(f), permits a provider to obtain judicial review of a
final decision of either the Board or the Administrator by filing
a civil action within 60 days of the date on which the provider
receives such decision.  (See also 42 C.F.R. § 405.1877).  For
your convenience, a copy of each of the above-referenced
authorities is enclosed.

Enclosures

**§ 405.1875  Administrator's review.**

(a) *General rule.* (1) Except for a Board determination under § 405.1842 that it lacks the authority to decide an issue, the Administrator, at his or her discretion, may review any final decision of the Board, including a decision under § 405.1873 about the Board's jurisdiction to grant a hearing. The Administrator may exercise this discretion on his or her own motion, in response to a request from a party to a Board hearing or in response to a request from HCFA.

(2) The Office of the Attorney Advisory will examine the Board's decisions, the requests made by a party or HCFA and any submission made in accordance with the provisions of this section in order to assist the Administrator in deciding whether to exercise this review authority.

(b) *Request for review.* A party or HCFA requesting the Administrator to review a Board decision must file a written request with the Administrator within 15 days of the receipt of the Board decision.

(c) *Criteria for deciding whether to review.* In deciding whether to review a Board decision, either on his or her own motion or in response to a request from a party to the hearing or HCFA, the Administrator will normally consider whether it appears that:

(1) The Board made an erroneous interpretation of law, regulation or HCFA Ruling;

(2) The Board's decision is not supported by substantial evidence or

(3) The case presents a significant policy issue having a basis in law and regulations, and review is likely to lead to the issuance of a HCFA Ruling or other directive needed to clarify a statutory or regulatory provision;

(4) The Board has incorrectly assumed or denied jurisdiction or extended its authority to a degree not provided for by statute, regulation or HCFA Ruling; and

(5) The decision of the Board requires clarification, amplification, or an alternative legal basis for that decision.

(d) *Decision to review.* (1) Whether or not a party or HCFA has requested review, the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board and, if so, will indicate the particular issues he or she will consider.

(2) The Administrator may decline to review a case or any issue in a case even if a party has filed a written request for review under paragraph (b) of this section.



days of receipt of a notice that the Administrator has decided to review a Board decision, a party or HCFA may submit to the Administrator, in writing:

(i) Proposed findings and conclusions;

(ii) Supporting views or exceptions to the Board decision;

(iii) Supporting reasons for the exceptions and proposed findings; and

(iv) A rebuttal of the other party's request for review or other submissions already filed with the Administrator.

(2) These submissions shall be limited to issues the Administrator has decided to review and confined to the record of the Board hearing.

(3) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the decision be remanded and state reasons for doing so. Reasons for a request to remand may include new, substantial evidence concerning—

(i) Issues presented to the Board; and

(ii) New issues that have arisen since the case was presented to the Board.

(4) A copy of any written submission made under this paragraph shall be sent simultaneously to each other party to the Board hearing and to HCFA, if HCFA has previously—

(i) Requested that the Administrator review a Board decision or filed a written submission in response to a party's request for review.

(ii) Responded to a party's request for review; or

(iii) Submitted material after the Administrator has announced that he or she will review a Board decision.

(f) *Ex parte communications prohibited.* All communications from any of the parties or HCFA about a Board decision being reviewed by the Administrator must be in writing and must contain a certification that copies have been served on the parties and HCFA, as appropriate. The Administrator will not consider any communication that does not meet these requirements or is not submitted within the required time limits.

(g) *Administrator's decision.* (1) If the Administrator has notified the parties and HCFA that he or she has decided to review a Board decision, the Administrator will affirm, reverse, modify or remand the case.

(2) The Administrator will make this decision within 60 days after the provider received notification of the Board decision and will promptly mail a copy of the decision to each party and to HCFA.

(3) Any decision other than to remand will be confined to—

(i) The record of the Board, as forwarded by the Board;

(ii) Any materials submitted under paragraphs (b) or (e) of this section; and

(iii) Generally known facts that are not subject to reasonable dispute.

(4) The Administrator may rely on prior decisions of the Board, the Administrator and the courts, and other applicable law, whether or not cited by the parties and HCFA.

(h) *Remand.* (1) A remand to the Board by the Administrator vacates the Board's decision.



**Board to take further action with respect to the development of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board.** The following are not acceptable bases for remand—

(i) Presentation of evidence existing at the time of the Board hearing that was known or reasonably could have been known;

(ii) Introduction of a favorable court case that was either not available in print at the time of the Board hearing or was decided after the Board hearing;

(iii) Change of a party's representation before the Board;

(iv) Presentation of an alternative legal basis concerning an issue in dispute; or

(v) Attempted retraction of a waiver of a right made before or at the Board hearing.

(3) After remand, the Board will take the action requested in the remand action and issue a new decision.

(4) The new decision will be final unless the Administrator reverses, affirms, modifies, or again remands the decision in accordance with the provisions of this section.

[48 FR 65773, Oct. 7, 1983]

# THE SOCIAL SECURITY ACT AS AMENDED - TITLE XVIII

## Section 1878(f)(1) Judicial Review

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

§ 405.1877  Judicial review.

(a) *General rule.* Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—

(1) A final decision by the Board; or

(2) Any reversal, affirmance, or modification by the Administrator.

The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b) *Administrator declines to review a Board decision.* If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c) *Administrator does not act after reviewing a Board decision.* If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under § 405.1875(g)(2).

(d) *Matters not subject to judicial review.* Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in section 1886(d)(7) of the Act and § 405.1804.

(e) *Group appeals.* Any action under this section by providers that are under common ownership or control (see § 413.17 of this chapter) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f) *Venue for appeals.* An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (§ 413.17 of this chapter), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g) *Service of process.* Process must be served as described under 45 CFR part 4.

[48 FR 39836, Sept. 1, 1983, as amended at 48 FR 45774, Oct. 7, 1983; 51 FR 34793, Sept. 30, 1986]

(a)  General rule
Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—
(1)  A final decision by the Board; or
(2)  Any reversal, affirmance, or modification by the Administrator.
The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b)  Administrator declines to review a Board decision
If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c)  Administrator does not act after reviewing a Board decision
If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under Section 405.1875(g)(2).

(d)  Matters not subject to judicial review
Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in Section 1886(d)(7) of the Act and Section 405.1804.

(e)  Group appeals
Any action under this section by providers that are under common ownership or control (see Section 405.427) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f)  Venue for appeals
An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (Section 405.427), must be brought by such providers as a group with respect to any matter



involving an issue common to the providers.



(g)  Service of process

Process must be served as described under 45 CFR Part 4.

(41 FR 52051, Nov. 26, 1976.  Redesignated at 42 FR 52826, Sept. 30, 1977 amended at 48 FR 39836, Sept. 1, 1983; 48 FR 45774, Oct. 7, 1983)

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

### I (a) PLAINTIFFS

EDWARD W. SPARROW HOSPITAL ASSOCIATION d/b/a SPARROW HOSPITAL

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Ingham, MI
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Kenneth R. Marcus, Esq.
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
Detroit, MI 48226
Telephone (313) 465-7470

### DEFENDANTS

MICHAEL O. LEAVITT

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Case: 1:08-cv-01021
Assigned To : Collyer, Rosemary M.
Assign. Date : 6/13/2008
Description: Admn. Agency Review

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O  1 U.S. Government Plaintiff
O  3 Federal Question (U.S. Government Not a Party)
⊙  2 U.S. Government Defendant
O  4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

O  A. Antitrust

☐ 410 Antitrust

O  B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

⊙  C. Administrative Agency Review

☒ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

O  D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

O  E. General Civil (Other)     OR     O  F. Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

③

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
42 USC Section 1395oo. Final decision of Secretary of Health and Human Services.

**VII. REQUESTED IN COMPLAINT** — CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ To Be Determined   Check YES only if demanded in complaint   JURY DEMAND: YES ☐ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE 6.13.08   SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.